

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-23-00150-CV

---

IN THE INTEREST OF B.U., A CHILD

---

On Appeal from the 97th District Court
Montague County, Texas
Trial Court No. 2022-0075M-CV

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

Appellant C.C. (Mother)[1] appeals the trial court's order terminating her parental rights to her son, B.U. In three issues, Mother contends that the evidence is legally insufficient to support the conduct-specific grounds for termination and both legally and factually insufficient to support the trial court's finding that terminating Mother's parental rights is in B.U.'s best interest. Because we overrule Mother's dispositive issues, we affirm the trial court's termination judgment.

## I. BACKGROUND

Mother, who has a long history of involvement with the Texas Department of Family and Protective Services (the Department),[2] has had four children. Mother's oldest child is Joseph, who was fathered by Mother's brother during a sexual assault.[3] Mother had two more children, Jackson and Justinia, with a man named Peter, but her

---

[1]To protect the anonymity of the child associated with this appeal, we use pseudonyms or initials to refer to him and his family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Nora Nevarez, a permanency advisor for 2INgage who supervised B.U.'s case, testified that Mother has a "lengthy" Department history and that she has been given the opportunity to "work services" more than once since 2014. Mother confirmed that she had Family-Based Safety Services cases in 2016 and 2019 and admitted that she had the opportunity to work services—including parenting, counseling, and anger management courses—during both cases. Mother also admitted that the Department removed two of her children in March 2021.

[3]According to the Department, Mother does not have custody of Joseph "due to past CPS involvement." Mother testified that Joseph lives with her mom (Joseph's grandma), who has "temporary guardianship" of him.

parental rights to these children have been terminated. B.U., whose alleged father Cory[4] was Peter's brother, is Mother's youngest child.

In March 2022, the Department filed suit seeking temporary managing conservatorship of B.U. As grounds for removal, the Department alleged that Mother (1) had left B.U. in the care of Jackson and Justinia, B.U.'s elementary-aged half-siblings,[5] on a minimum of three occasions; (2) had continued to allow Brad to be around B.U. despite his continued drug use and acts of domestic violence; and (3) had been "deceptive" during B.U.'s monitored return.

The Department created a service plan for Mother to ensure that she could provide a safe environment for B.U.[6] The trial court approved this plan in May 2022 and ordered Mother to comply with it.

Although Mother completed certain requirements of her service plan—including completing a psychological evaluation and classes in parenting and anger management—she admitted at trial that she had failed to complete all of the required

---

[4]Cory died five months before B.U. was born; therefore, his paternity could not be confirmed by a DNA test. Initially, the Department alleged that Mother's then-boyfriend Brad was B.U.'s father, but DNA testing excluded him as the father. After Brad was excluded as the father, Mother consistently alleged that Cory was B.U.'s father and that no one else could be his father.

[5]Mother testified that Jackson and Justinia were each seven years old as of September 2022.

[6]The Department also created a service plan for Brad, but it was conditioned on his being established as B.U.'s father. As noted above, DNA testing ultimately excluded Brad as B.U.'s father.

services. According to Nevarez, the service plan requirements that Mother failed to complete included, among other things, "provid[ing] and maintain[ing] a safe and stable home" for B.U. and "not associat[ing] with persons who use, manufacture, or sell illegal substances or have [a] criminal history associated with drugs or family violence." Nevarez explained that Mother had failed to comply with both of these requirements by continuing to associate with Brad, who had been convicted of multiple drug-related offenses and who Mother acknowledged was a "drug addict," and to allow him into her home even though his presence had been a "major" reason that the Department had removed B.U.

Following a bench trial in March 2023, the associate judge found (1) that there were grounds for terminating Mother's parent–child relationship with B.U. because Mother had endangered B.U.'s physical or emotional well-being, *see* Tex. Fam. Code. Ann. § 161.001(b)(1)(D), (E), and had failed to comply with the provisions of a court order specifically establishing the actions necessary for Mother to obtain B.U.'s return to her custody, *see id.* § 161.001(b)(1)(O), and (2) that termination was in B.U.'s best interests, *see id.* § 161.001(b)(2). Based on these findings, the associate judge terminated Mother's parental rights to B.U.

After granting Mother's request for a de novo hearing, *see* Tex. Fam. Code Ann. §§ 201.015, 201.2042, the district court adopted the associate judge's findings and signed a final order terminating the parent–child relationship. This appeal followed.

## II. DISCUSSION

In three issues, Mother contends that the evidence is insufficient to uphold the findings supporting termination.

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between

5

a parent and a child, it must first observe fundamentally fair procedures." *E.R.*, 385 S.W.3d at 554 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1388). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due

6

deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved one or more of the conduct-specific grounds on which the termination was based and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## A. Endangerment Under Section 161.001(b)(1)(D) and (E)

In her first issue, Mother challenges the legal sufficiency[7] of the trial court's predicate-ground findings under Family Code Section 161.001(b)(1)(D) and (E).

---

[7]Although Mother challenges both the legal and factual sufficiency of the trial court's best-interest finding, she challenges only the legal sufficiency of the trial court's predicate-ground findings. Thus, we analyze the trial court's Subsection (D) and (E) findings solely under the legal-sufficiency standard. *See Hardy v. C.P.I. Sales, Inc.*, 511 S.W.2d 89, 93 (Tex. App.—Houston [1st Dist.] 1974, no writ) ("A legal sufficiency assignment cannot be enlarged on appeal to embrace a factual sufficiency point of error, or vice versa."); *see also Tex. Farm Prods. Co. v. Stock*, 657 S.W.2d 494, 497–98 (Tex. App.—Tyler 1983, writ ref'd n.r.e.) (points of error and arguments that assert only no-evidence points do not present factual-sufficiency points); *cf. Gillespie v. Nat'l Collegiate Student Loan Tr. 2005-3*, No. 02-16-00124-CV, 2017 WL 2806780, at *2 (Tex. App.—Fort Worth June 29, 2017, no pet.) (mem. op.) (declining to address factual-sufficiency claim raised only "in passing" when briefing focused on legal sufficiency).

Subsections (D) and (E) both require a finding of endangerment. "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *Tex. Dep't of Human Servs.*, 727 S.W.2d at 533.

Endangerment under Subsection (D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(b)(1)(D)."). To prove endangerment, it is not necessary that a parent's conduct be directed at the child or that the child actually suffer injury. *J.T.G.*, 121 S.W.3d at 125. We may consider a parent's endangering conduct toward other children to determine whether the parent engaged in behavior that endangered

8

the child at issue. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *11 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.). Additionally, Subsection (D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

A parent's choice to continue a romantic relationship with a partner who exposes the child to domestic violence can constitute endangerment under Subsection (D) because such exposure may cause traumatic harm to a child. *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.) (concluding that parent's choice to continue romantic relationships that exposed child to domestic violence resulting in traumatic emotional harm to child supported environmental endangerment predicate); *see also In re S.L.L.*, No. 13-19-00442-CV, 2020 WL 103862, at *6 (Tex. App.—Corpus Christi–Edinburgh Jan. 9, 2020, no pet.) (mem. op.) (noting that a parent's willingness to tolerate and excuse erratic behavior from a romantic partner at the expense of a child's physical and emotional well-being may be considered in endangerment analysis). Similarly, a parent's choice to continue relationships with people who abuse illegal drugs may constitute evidence of endangerment. *See In re K.W.*, No. 09-19-00442-CV, 2020 WL 1755985, at *8 (Tex. App.—Beaumont Apr. 9, 2020, pet. denied) (considering mother's continued relationships with individuals who had tested positive for illegal drugs or were known to use illegal drugs as evidence of endangerment).

9

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re T.T.F.*, 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.); *accord In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. denied). Either the parent's conduct or the conduct of a person with whom the parent knowingly leaves a child that endangers his or her physical or emotional well-being is sufficient. *E.M.*, 494 S.W.3d at 221. Termination under Subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009).

Applying the standards articulated above, we conclude that legally sufficient evidence supports the trial court's findings under Subsections (D) and (E) that Mother endangered B.U. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

The Department's primary allegation regarding endangerment concerned Mother's relationship with Brad. The record shows that Mother remained in a romantic relationship with Brad until at least December 2022 and that B.U. had been consistently exposed to Brad before being removed from the home. Brad has been convicted of multiple drug-related offenses, and Mother herself described him as "a drug addict who refuses to quit." Further, Mother acknowledged that Brad had committed acts of domestic violence against her and admitted that his presence in the home endangered her children because he is "aggressive" and will "act out" if he does

10

not get his way. She also agreed that being around Brad was traumatic for B.U. Based on this evidence, the trial court reasonably could have concluded that Mother was aware that allowing Brad access to B.U. created a potential for danger and that she endangered B.U. by disregarding that risk. *See In re B.C.S.*, No. 04-21-00544-CV, 2022 WL 2056365, at *5 (Tex. App.—San Antonio June 8, 2022, pet. denied) (mem. op.) ("'[A] child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards.'" (quoting *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.))); *see also K.W.*, 2020 WL 1755985, at *8; *O.E.R.*, 573 S.W.3d at 906.

Mother points to her testimony that she believed that Brad had remained clean and sober from May 17, 2022, until he relapsed in September 2022 as evidence that she was unaware of the risk that Brad posed to B.U. But even if we accept this testimony as true—which the trial court, as the factfinder and sole judge of witnesses' credibility, *see J.O.A.*, 283 S.W.3d at 346, was not required to do—this clean-and-sober period did not begin until approximately six weeks after B.U. had been removed from the home. Therefore, this evidence does not support an inference that Mother was unaware of the risk that Brad's drug use posed to B.U. while he remained in her care. Indeed, as noted above, Mother admitted that exposing B.U. to Brad was traumatic and endangering.

Mother also argues that "[w]hile it may have been unwise to continue to have any contact with [Brad]," she "rehabilitated herself by moving" to her mother's house

and "ending the relationship months before trial."  But the record shows that Mother has been consistently untruthful about ending her relationship with Brad, repeatedly telling caseworkers and the trial court that she was "done" with Brad only to continue to see him.  In fact, both Nevarez and Lorra Lierly, the CASA[8] supervisor assigned to B.U.'s case, expressed concerns about Mother's untruthfulness, particularly regarding her relationship with Brad.  Thus, the trial court had reason to disbelieve Mother's claim that she had ended her relationship with Brad and, as the sole factfinder, was free to reject this testimony.  *See J.O.A.*, 283 S.W.3d at 46; *In re R.S.*, No. 01-18-00058-CV, 2020 WL 3393069, at *9 (Tex. App.—Houston [1st Dist.] June 18, 2020, no pet.) (mem. op.) ("The trial court did not find [m]other credible, and as the sole factfinder, the trial court was free to reject her testimony . . . .").

Moreover, even if the trial court believed Mother's claim that she had stayed away from Brad from December 2022 to the start of trial in March 2023, it could have reasonably concluded that this period of improved conduct was of too short a duration to negate Mother's past history of irresponsible choices.  *See J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.");

[8]CASA stands for Court Appointed Special Advocates.  CASA volunteers work with children in the foster care system to "advocate for their best interests and to speak up for them in court."  Child Advocates—CASA of Red River, https://casawf.org/ (last visited September 1, 2023).

*In re K.W.*, 2020 WL 1755985, at *8 ("While testimony established that [m]other and [f]ather were very cooperative and that [m]other had made strides toward reunification by getting stable employment and taking her required substance abuse classes, counseling, and parenting classes, 'even strong evidence of improvement cannot conclusively negate past history.'" (quoting *In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (mem. op.))).

Because the evidence, when viewed in the light most favorable to the trial court's decision, supports a finding that Mother—ignoring the known risks—endangered B.U. by exposing him to Brad, *see B.C.S.*, 2022 WL 2056365, at *5, we hold that it is legally sufficient to support the termination of Mother's parental rights under Subsections (D) and (E).[9] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *J.O.A.*, 283 S.W.3d at 344. Accordingly, we overrule Mother's first issue.

## B. Best Interest Under Section 161.001(b)(2)

In her third issue,[10] Mother contends that the evidence is legally and factually insufficient to show that termination of her parental rights to B.U. is in the child's

---

[9]The Department alleged that, in addition to exposing B.U. to Brad, Mother also endangered B.U. by leaving him in the care of his elementary-aged half-siblings on multiple occasions. Because we hold that the evidence is legally sufficient to support a finding that Mother endangered B.U. by exposing him to Brad, we need not address the sufficiency of the evidence supporting the Department's other endangerment allegation. *See* Tex. R. App. P. 47.1.

[10]Because we uphold the trial court's findings under Subsections (D) and (E) and because only one finding under Section 161.001(b)(1) is necessary to support termination, we decline to address Mother's second issue in which she challenges the

best interest. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both a Subsection (b)(1) predicate ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Factors that the trier of fact in a termination case may also use in determining the best interest of the child include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27.

trial court's Subsection (O) finding. *See* Tex. R. App. P. 47.1; *In re E.P.C.*, 381 S.W.3d 670, 684 n.3 (Tex. App.—Fort Worth 2012, no pet.).

Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.*

Mother contends that the first *Holley* factor—the desires of the child—weighs against the trial court's best-interest finding because B.U. "is bonded to her" and "is comfortable in her presence." But based on her observations of Mother's visits with B.U., Nevarez disagreed that there was a bond between B.U. and Mother. She testified that B.U. tends to "cling" to his foster mother when she drops him off for visitation and that while B.U. engages and plays with Mother during her visits, he is always happy to see his foster mother and father afterward. Thus, we cannot conclude that this factor weighs against the trial court's best-interest finding.

Mother also claims that she has a safe, appropriate home for B.U. But Lierly testified that she had a number of concerns after visiting the home, which she described as "dark and very dirty" with a "[v]ery heavy smoke smell." She was particularly concerned about the "very dirty" floors because B.U. would be crawling on them. She also indicated that "[t]here was a lot of debris, junk stuff in the yard" and that there were a number of objects lying around the house that could pose a potential danger for B.U.

Moreover, while Mother moved to her mom's house to get away from Brad, she acknowledged that Brad knows where her mom's house is, and he could therefore attempt to contact her there just as he had previously done at her apartment. Indeed, Nevarez testified that no matter where Mother lives, the issues that made her previous

homes unsafe will persist because it is Mother's behavior—particularly her inability to be protective of her children—that makes living with her unsafe.

Further, Nevarez testified that she had "no concerns" about B.U.'s placement with his foster family and that his foster parents are "very loving [and] caring" and treat B.U. like one of their own children. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (considering fact that child was being well cared for by foster parents as a factor in best-interest determination). She also stated that B.U.'s foster parents have expressed their desire to adopt B.U. and that the Department planned to pursue such an adoption if Mother's parental rights were terminated. *See C.H.*, 89 S.W.3d at 28 (noting that evidence about placement plans and adoption are relevant to child's best interest).

In addition, the record shows that Mother's parental rights to Jackson and Justinia have been terminated, *see In re B.K.D.*, 131 S.W.3d 10, 22 (Tex. App.—Fort Worth 2003, pet. denied) (considering parent's CPS history as a factor in best-interest analysis), and that B.U.'s attorney ad litem supported the termination of Mother's parental rights in this case, *see In re G.H.*, No. 02-17-00193-CV, 2017 WL 4683925, at *9 (Tex. App.—Fort Worth Oct. 19, 2017, no pet.) (mem. op.) (considering an attorney ad litem's recommendation in a best-interest review).

Considering all of the evidence discussed above and the remainder of the record,[11] we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights was in B.U.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *A.B.*, 437 S.W.3d at 500; *J.P.B.*, 180 S.W.3d at 573. Accordingly, we overrule Mother's third issue.

## III. CONCLUSION

Having overruled Mother's dispositive issues, we affirm the trial court's judgment terminating Mother's parental rights to B.U.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: September 14, 2023

---

[11]Mother, citing *In re A.J.A.R.*, No. 14-20-00084-CV, 2020 WL 4260343, at *8 (Tex. App.—Houston [14th Dist.] July 24, 2020, pet. denied) (mem. op.), argues that her substantial compliance with her service plan should be considered as evidence that weighs against the trial court's best-interest finding. However, as noted above, the service plan requirements that Mother failed to complete included, among other things, "provid[ing] and maintain[ing] a safe and stable home" for B.U. and "not associat[ing] with persons who use, manufacture, or sell illegal substances, or have [a] criminal history associated with drugs or family violence." These are significant failures. Thus, even if we accept Mother's assertion that she completed "the vast majority" of her other service plan requirements, this weighs only slightly, if at all, against the trial court's best-interest finding and, taken together with the remainder of the record, is certainly not significant enough to prevent the trial court from reasonably forming a firm belief or conviction that termination was in B.U.'s best interest. *See C.H.*, 89 S.W.3d at 28.